Filed 5/6/15  P. v. Rogers CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>BRETT ANTHONY ROGERS,<br><br>    Defendant and Appellant. | C076027<br><br>(Super. Ct. No. CRF13567) |

Defendant Brett Anthony Rogers was charged with two counts of kissing E. M., a child under the age of 14, with lewd intent (Pen. Code, § 288, subd. (a)) and a count of communicating with E. M. with the intent to commit a sexual offense in which she was involved.

Defendant pled no contest to one count of kissing with the understanding that he would not receive a prison sentence greater than the low term of three years.  In

exchange, the other kissing count was dismissed outright and the final charge was dismissed with a *Harvey*[1] waiver.

On appeal, defendant contends the trial court abused its discretion and violated his due process rights when it refused to place him on probation and imposed the prison sentence. We affirm.

FACTS

On the written plea form, defendant agreed that the trial court could consider the "Police report" as proof of the factual basis of the plea.

During the plea colloquy, the prosecutor clarified that the "factual basis comes from Yuba County Sheriff's Office report 13-3619." The stipulated factual basis did not include a September 30, 2013, peace officer's affidavit of probable cause to detain defendant. The prosecutor stated, and defense counsel stipulated to, the following factual basis for the plea.

"[T]he first kiss," occurred sometime between July 30, 2013, and August 10, 2013. Defendant, age 21, kissed E. M., a 13-year-old child, with the intent to arouse, appeal to, or gratify his or the child's lust, passion, or sexual desire. They had a dating relationship for approximately one month and kissed as part of that relationship.

The communicating charge occurred between July 30, 2013, and August 25, 2013. Defendant communicated with E. M. by text message or "Facebook" message to solicit E. M. to engage in a lewd act.

In her report, the probation officer summarized Yuba County Sheriff's Office report 13-3619 as follows:

---

[1] *People v. Harvey* (1979) 25 Cal.3d 754. *Harvey* has been held inapplicable in Penal Code section 288 cases. (*People v. Lamb* (1999) 76 Cal.App.4th 664, 674.) Defendant does not claim his plea was invalid for this reason.

"In July 2013, E. M. . . . met [defendant] while with her friend, [J. C.] (15 years of age). [J. C.] asked [defendant] if he was 21. He told her he was and they began talking. [J. C.] asked 'which one of us would you date if we were 21?' [Defendant] pointed to E. M. [J. C.] told [defendant] E. M. was 13 years old.

"On July 30, 2013, [defendant] 'asked her (E. M.) out.' E. M. advised she kissed [defendant] for the first time in August 2013, when she told her parents she had to go get something out of the car later in the evening. E. M. met [defendant] and they 'kissed and hugged' that night.

"Between July 20, 2013 and August 25, 2013, [defendant] and E. M. were messaging each other through the social networking site 'Facebook.' On their Facebook exchanges both [defendant] and E. M. discussed their age difference, and that they 'love' each other, and previous kisses. During one exchange, E. M. asked [defendant] if he uses the date 12/27/11 as his signature. [Defendant] indicated he does use that date as his signature. The following is a portion of the Facebook exchange between [defendant] and E. M.:

"E. M.: 'My parents seriously need to go inside.'

"[DEFENDANT]: 'Lol I need to get laid 12-27-11'

"E. M.: 'Haha not by me ha ha LOL'

"[DEFENDANT]: 'lol'

"E. M.: 'Ha ha so who do u wanna get laid by?' 'Who?'

"[DEFENDANT]: 'Only one person but I told her ill wait 12-27-11'

"E. M.: 'Oh who? Who is this ho'

"[DEFENDANT]: 'You 12-27-11'

"E. M.: 'Aww ur so sweet I love u'

"[DEFENDANT]: 'Love u 2 12-27-11' "

3

DISCUSSION

Defendant contends the trial court relied on "erroneous findings" that he lacked candor and that an evaluating psychologist's report was unfavorable. He claims the court failed to consider properly the factors in Penal Code section 1203.067 and California Rules of Court,[2] rule 4.414. He argues his case is unusual and the interests of justice would best be served by a grant of probation. For these reasons, he claims the refusal of probation was arbitrary, capricious, unreasonable, and a denial of his due process rights. None of these points has merit.

A

*Background*

In a report dated October 25, 2013, the probation officer recommended that defendant be committed to prison for three years. The trial court reviewed the report on November 4, 2013.

On November 12, 2013, the trial court appointed Daisy Switzer, Ph.D., to evaluate defendant. She conducted her evaluation on November 27, 2013.

In December 2013, the trial court received Dr. Switzer's report. She reported that during her interview, defendant "described his mood as '*fine*' and said he is '*usually a happy person, but right now I miss my fiancée because of this. This is unfair because I was accused and I can't fight it, so I didn't try. But my fiancée knows I didn't do it.*' He was often distracted by a need to reiterate similar statements."

Defendant told Dr. Switzer he "had no idea who would want to set him up for illegal sex with the victim and denied he'd ever touched her in any manner, sexual or otherwise. He denied he had any interest in doing so. He denied he had ever touched any

_____

**2** Further references to "rules" are to the California Rules of Court.

4

underage individuals, including the victim in this case. He said he only pled to the charge to put the current case behind him and get on with his life."

Dr. Switzer noted that the results of defendant's "Multiphasic Sexual Inventory" suggested he is "dishonest about his interest in sex, disinterested in treatment, and only minimally educated in human sexuality." Defendant's "Minnesota Multiphasic Personality Inventory-2-revised" indicated that defendant "revealed a desire to present himself in an implausibly favorable manner, denying even the most basic faults that most subjects acknowledge." Defendant's "Sexual Violence Risk Tool" (risk tool) said defendant was at "<u>moderate risk</u> level for reoffense."

Under "<u>Specific Findings</u>," Dr. Switzer wrote: "F) Is the defendant amenable to rehabilitation? [¶] Minimally. [¶] The defendant '*will do whatever it takes to have a second chance*' yet he is unwilling to discuss his actions with the alleged victim. His denial of any interaction is inconsistent with his plea. He needs to admit his actions if he is going to benefit from any treatment."

After reviewing Dr. Switzer's report, the trial court indicated "it is not a favorable report" and said it was not inclined to grant probation. The sentencing hearing was continued to allow Dr. Switzer to clarify certain issues.

On December 23, 2013, defendant wrote to the trial court, stating: "I'm writing this letter to possibly help my chance of getting a second chance before going to prison for the first time. At first I denied the charge's [*sic*] because I haven't been taught what's wrong from right. Yes I have had a hard time growing up as a kid. That does not excuse the crime that I have done. I have gone over in my head what I did and I have realized that I was in the wrong. *I told the doctor I did do it.* I haven't seen or even gone over the report from her. I denied doing it when probation came because I was trying to figure out what I did wrong. I'm not trying to sound like I'm begging. I will go to treatment classes sex offender classes, anything that I need to do. I'll do it. The reason I'm asking for a second chance is not because I want to be out of custody. It's because I want to

5

learn from my mistakes and get the counseling and help to let go of my past and not make the same mistakes. I would also like to finish college and go to work. If possible and with your permission I would like to write an apology letter to the family of the victim. I'm hoping that this letter is helpful on my end to earn a second chance and to learn from my mistakes. Please and thank you." (Italics added.)

On January 21, 2014, the trial court reviewed defendant's letter with both counsel.

Dr. Switzer was present at the sentencing hearing on January 31, 2014. The trial court asked, "did the defendant tell you that he did this" crime, and Dr. Switzer answered, "No." Dr. Switzer continued: "[Defendant] did not say that he committed the offense. When I questioned him on his plea, he wanted to put this offense behind him and he decided to plead in order to make that happen more quickly. And, in fact, he went so far as to say his fiancée knew he didn't do it when stating his innocence."

When the trial court asked what psychological treatment defendant would need, Dr. Switzer answered, "He needs to admit the crime. And I think it's a positive indicator that he actually seems to have done that." When the court inquired, "You indicated he was minimally amenable to rehabilitation," Dr. Switzer answered, "He did say he would do whatever it took to get a second chance. So that was -- I thought that was a good start."

When the trial court asked whether defendant could be trusted if released to the public, Dr. Switzer stated in relevant part: "The [risk tool] found him at moderate risk for reoffense, which is -- it's average. He has some factors that suggest that he will reoffend, but he also -- he's young. That's a risk factor. He has a history of [attention deficit disorder]. And he has some conduct disorder problems in the past. Those are risk factors that point to recidivism. He also has some things that are used against that. He seemed willing to reconsider his medical marijuana. He -- his work history was unstable. So that's actually a risk factor. He has past supervision failure. That's probably his most

6

severe risk factor. He does have some risk factors that give me pause to think that he was at low risk, definitely."

When defense counsel asked whether defendant's letter to the court would change her opinion whether he is amenable to rehabilitation, Dr. Switzer answered, "I have mixed reviews of that. I would hope that it would." When the prosecutor inquired about defendant's claim that he told the doctor he "did do it," Dr. Switzer answered, "I wondered if he didn't confuse me with the investigator when he wrote the letter. I thought, well, I mean, there's no way he could have thought that he told me about the crime because we went so far as to do testing and I asked him about the crime. I was with him for several hours. I mean, he very definitely did not tell me about the crime." Dr. Switzer added that dishonesty is a risk factor on the "Hare" pspathology checklist, which is the "most validated instrument for reoffense."[3]

At the continued sentencing hearing on March 10, 2014, the trial court stated: "I received this letter from defendant [in which] he took responsibility for what he did, it was December 23rd, 2013. I want to indicate that counsel is very artful and eloquent. I can get the real picture of how the defendant behaved from his contact with the victim and her family, how he lied to them, how he was deceitful, how he was manipulative. The same pattern continued with the Probation Department, and I respect their evaluation with respect to the defendant not being suitable for a grant of probation because by the time he got to the Probation Department he is blaming everybody else, indicating that his Facebook account got hacked, he didn't do it, things of that nature. And then I'm considering what he said to the doctor also. And I'm concluding that the report was not favorable from Dr. Switzer. Defendant writes me a letter saying that he did tell the

---

[3]     The People mistakenly claim that Dr. Switzer had "noted that dishonesty was the most validated risk factor for reoffending." In fact, she said that the "Hare" was the most validated *instrument*; not that dishonesty was the most validated *factor*.

doctor what happened, while realistically the doctor contradicted him when she came in to testify. I wanted to double check on that fact. I wanted to double check on all of these things because of several reasons. Defendant is relatively youthful. He comes from a troubled past. I do consider, you know, someone's ability to be supervised on probation and why they did what they did. I did consider also his own childhood; no parents to really tell him right from wrong. He is abused by his own family. But then I'm considering also he turns around and preys on neighborhood kids. [¶] Considering all of these things, the report of the Probation Department, I respect the opinion of the doctor in this case, there is no way that I can conclude that society would be safe if I released defendant back to the public. That is, on such a young man, a very unfortunate conclusion for me to have to reach, but it's the only one I can reach in this case. He is not suitable for a grant of probation only because of his lack of candor essentially. He has to blame himself. He couldn't be forthright, frank and honest with people who were trying to help him. He can't be honest with a doctor who is assessing whether or not he can be treated. As long as he is going to have that mindset, then he is not ready to account for what he did. I wish he had conducted himself differently, but he didn't."

B

*Relevant Legal Principles*

"[P]robation is 'an act of leniency, not a matter of right.' [Citation.] The decision to grant or deny probation requires consideration of all the facts and circumstances of the case." (*People v. Birmingham* (1990) 217 Cal.App.3d 180, 185-186.) In reaching its decision, the trial court should consider whether confinement is necessary to protect the public from the defendant, whether the defendant can best be rehabilitated through imprisonment or normal community contact, and whether probation would unduly depreciate the seriousness of the offense. (*People v. Axtell* (1981) 118 Cal.App.3d 246, 255; see *People v. Bolton* (1979) 23 Cal.3d 208, 217.) Absent a clear showing the decision to deny probation is arbitrary or irrational, it is presumed the trial court acted to

8

achieve legitimate sentencing objectives.  (*Birmingham*, at p. 186; see *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

"The decision whether to grant or deny probation is reviewed under the abuse of discretion standard.  [Citations.]  'An order denying probation will not be reversed in the absence of a clear abuse of discretion.  [Citation.]  In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary.' " (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091.)

C

*Defendant's Contentions Are Without Merit*

Defendant first contends that, despite his initial lack of candor, his "subsequent admission that he had done wrong" was a positive indicator.  Defendant claims his "late[] realization that he must be forthcoming" weighed in favor of placing him on probation because it demonstrated his willingness (rule 4.414(b)(3)) and ability (rule 4.414(b)(4)) to comply with terms of probation.

But defendant's "subsequent admission" was tainted by his incorrect claim that he had made the same admission to Dr. Switzer whose evaluation and testimony made plain he had not done so.  The trial court was entitled to question whether defendant "realiz[ed]" that he "must be forthcoming" with accurate information and not embellish his "admission" with falsehoods that make him appear more suitable for probation.  The court was entitled to reason that, if the incorrect claim was intentional, it suggested an unwillingness to comply with probation; and if the claim was unintentional, it suggested an inability to comply.  The court's finding that defendant was not suitable for probation "because of his lack of candor" was not arbitrary, irrational, or an abuse of discretion. (*People v. Ferguson*, *supra*, 194 Cal.App.4th at p. 1091.)

Defendant next contends the trial court erred when it concluded Dr. Switzer's report was "unfavorable" in that it "did not favor a grant of probation."  He first notes

that she recommended "Monitored Sexual Offender treatment, specifically with regard to sexual education and victim awareness." But the recommendation that defendant receive treatment is not, by itself, a recommendation that probation be granted. Dr. Switzer did not address whether the requisite treatment was available in a custodial setting. Moreover, she "[d]eferred to [the p]robation [o]fficer" whether the treatment was available in the community. Without this information, Dr. Switzer was not in a position to recommend that defendant be released on probation.

Defendant appears to claim his letter to the trial court caused Dr. Switzer to reassess whether he was amenable to rehabilitation. The record does not support this claim.

As noted, Dr. Switzer's report stated: "Is the defendant amenable to rehabilitation? [¶] Minimally. [¶] The defendant '*will do whatever it takes to have a second chance*' yet he is unwilling to discuss his actions with the alleged victim. His denial of any interaction is inconsistent with his plea. He needs to admit his actions if he is going to benefit from any treatment." At the hearing the trial court asked Dr. Switzer, "[y]ou indicated he was minimally amenable to rehabilitation," and she answered, "[h]e did say he would do whatever it took to get a second chance. So that was -- I thought that was a good start." Thus, Dr. Switzer evaluated defendant's amenability to rehabilitation as "minimal" (as opposed to some lesser degree) *because* he had said (as quoted in the evaluation) that he would "do whatever it took to get a second chance."

On appeal, defendant mistakenly claims he made his statement *after* Dr. Switzer performed her initial evaluation and that she later drew a more favorable conclusion. Thus, defendant writes: "At the hearing to clarify Dr. Switzer's results, she . . . acknowledged that, although she *initially indicated* he was minimally amenable to rehabilitation, she *concluded* [*defendant's*] *later indication* that he would do whatever it took to get a second chance was a good start toward treatment." (Italics added.) In fact, when defense counsel asked Dr. Switzer whether defendant's letter would "change in any

10

way whether or not he is amenable to rehabilitation," she said merely "I have mixed reviews of that. I would hope that it would." She did not say his chances were more than minimal.

Defendant next claims Dr. Switzer placed him "at a 'low risk' to reoffend" and "ultimately concluded that [he] was 'definitely' at low risk [of] reoffending." The record does not support these claims.

Dr. Switzer stated in relevant part: "The [risk tool] found him at moderate risk for reoffense, which is -- it's average. He has some factors that suggest that he will reoffend, but he also -- he's young. That's a risk factor. He has a history of [attention deficit disorder]. And he has some conduct disorder problems in the past. Those are risk factors that point to recidivism. He also has some things that are used against that. He seemed willing to reconsider his medical marijuana. He -- his work history was unstable. So that's actually a risk factor. He has past supervision failure. That's probably his most severe risk factor. *He does have some risk factors that give me pause to think that he was at low risk, definitely*." (Italics added.)

We construe the phrase "give pause" as meaning to "cause one to hesitate." Thus, the highlighted passage means that the risk factors "definitely" *caused Dr. Switzer to hesitate to think that defendant was at low risk*. We therefore reject defendant's contention that "Dr. Switzer's professional opinion, upon clarification of the court and considering [defendant]'s initial lack of candor, was not unfavorable." The trial court's conclusion that the report *was unfavorable* was not arbitrary, irrational, or an abuse of discretion. (*People v. Ferguson*, *supra*, 194 Cal.App.4th at p. 1091.)

Defendant contends the record contains no "indication" that the trial court considered the rule 4.414 criteria affecting a decision to grant or deny probation. He recognizes that the probation report discussed the relevant criteria, and that defense counsel argued the criteria at sentencing. Nevertheless, he claims the court's

"communicated concerns and findings demonstrate the court failed to properly consider the other factors as related to [defendant] and his crimes."

Our review of the record does not reveal any misapplication of the rule 4.414 criteria. At most, it reveals that the trial court did not discuss several of the criteria on the record. But the court had no duty to discuss the criteria before "[i]mposing a prison sentence and thereby denying probation." (Rule 4.406(b)(2); *People v. Villanueva* (1991) 230 Cal.App.3d 1157, 1159-1160.) The court stated it would honor "the low-term cap" because the Penal Code section "288.1 report was not favorable" and defendant "is not suitable for a grant of probation because of his lack of candor." This is a sufficient statement of reasons for imposing the prison term.

DISPOSITION

The judgment is affirmed.


                                          ROBIE            , J.



We concur:



      NICHOLSON      , Acting P. J.



      BUTZ           , J.


12